UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————— x

THE PEOPLE OF THE STATE OF NEW YORK
by ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York,

Plaintiff,

-against-

CHARTER COMMUNICATIONS, INC. and
SPECTRUM MANAGEMENT HOLDING
COMPANY, LLC (f/k/a TIME WARNER CABLE,
INC.),

Defendants.

———————————————————————————— x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 4/27/17              │
└─────────────────────────────────┘
```

No. 17 Civ. 1428 (CM)

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR REMAND**

McMahon, C.J.:

The State of New York ("Plaintiff") brought this action in New York Supreme Court

against Defendants Charter Communications, Inc. ("Charter") and Spectrum Management

Holding Company, LLC ("Spectrum") (f/k/a Time Warner Cable, Inc. ("TWC")) (collectively,

"Defendants"), asserting that Defendants violated three New York consumer protection statutes

by promising to provide broadband Internet service at speeds they knew they could not deliver

and by promising reliable access to online content that they knew they could not provide.

Defendants obtained removal of the action to federal court, arguing that the Federal

Communications Act ("FCA") and regulations promulgated thereunder by the Federal

Communications Commission ("FCC") "completely preempt" Plaintiff's state-law causes of

action. Plaintiff now seeks remand back to state court. (Dkt. No. 21). For the reasons set forth

below, Plaintiff's motion is granted.

1

**Factual Background**

For purposes of a motion for remand, all non-jurisdictional facts alleged in the complaint are assumed to be true, *Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 677 (S.D.N.Y. 1996), and all doubts are resolved against removability and in favor of remand, *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007).

Before May 18, 2016, TWC provided and marketed cable broadband Internet service to New York subscribers under the brand name "Time Warner Cable." (Compl. ¶ 28.) On May 18, 2016, TWC merged with and into Spectrum, a subsidiary of Charter. (*Id.*) Since the merger, Charter and Spectrum have continued to provide Internet services to New York subscribers under the brand names "Time Warner Cable" and "Spectrum." (*Id.* ¶ 31.) Collectively, Defendants are the largest provider of residential Internet services in the state of New York, providing over 2.5 million households with Internet service. (*Id.* ¶ 2.)

According to the complaint, from January 1, 2012 to the present, Defendants have "conducted a systematic scheme to defraud and mislead subscribers to [their] Internet service by promising to deliver Internet service that [they] knew [they] could not and would not deliver." (*Id.* ¶ 3.) There were two components to this scheme: (1) Defendants promised to provide Internet speeds that they knew they could not deliver to subscribers; and (2) Defendants promised reliable access to online content (like Netflix, YouTube, and Amazon) that they knew they could not provide. (*Id.*)

Under the first component, Defendants leased equipment to their subscribers that they knew was physically incapable of achieving their advertised Internet speeds and failed to make adjustments to their network infrastructure that would enable subscribers to achieve the promised speeds. (*Id.* ¶ 4.)

In early 2013, Defendants determined (as a result of Internet speed tests conducted by the FCC) that the older-generation modems they leased to many customers were incapable of reliably achieving Internet speeds of even 20 Megabits per second ("Mbps"). (*Id.* ¶¶ 9, 110-13.) Despite the fact that many subscribers using such modems were paying for plans with advertised speeds much higher than 20 Mbps (some as high as 300 Mbps) (*id.* ¶¶ 77-80), Defendants failed to replace the older-generation modems and continued to charge customers for their high-speed plans (*id.* ¶¶ 9, 110, 114-59). Defendants then misrepresented to the FCC that they would replace the older-generation modems for all of their subscribers. In reliance on that representation, Plaintiff claims that the FCC excluded the speed tests on the older-generation modems from the FCC's subsequent public reports. (*Id.* ¶ 10.)

As a result, subscribers to Defendants' high-speed plans (100, 200, and 300 Mbps) achieved a median speed of between 28% and 55% of their advertised speed, according to speed tests reviewed by the New York Attorney General's office. (*Id.* ¶¶ 206-07.) These results were consistent with tests performed by the FCC, which also showed average speeds well below advertised levels. (*Id.* ¶¶ 208-13.) Defendants also manipulated the results of the FCC's speed tests through a strategy known as "overprovisioning." (*Id.* ¶ 214.) Overprovisioning is the process of "padding the test result average with scores from times when a service group was not heavily utilized." (*Id.* ¶ 217.)

Defendants also leased many older-generation wireless routers to subscribers, which were incapable of providing Internet access at speeds greater than 100 Mbps. (*Id.* ¶¶ 11, 62-66, 160-77.) In spite of this fact, Defendants continued to charge subscribers for plans promising speeds of 200 to 300 Mbps. (*Id.* ¶¶ 11, 174-77.) Due to this and other factors (wireless speeds are affected by distance from the wireless router, interference from other electronics, and the number

of devices accessing the router), consumers connecting wirelessly typically received between 15% and 58% of their advertised access speed. (*Id.* ¶¶ 16-17, 221-41.)

Defendants also failed to make necessary improvements to their network infrastructure that they knew were necessary in order to deliver promised Internet access speeds even to subscribers with newer-generation modems and wireless routers. (*Id.* ¶¶ 13, 178.) This is because Defendants knowingly allocated insufficient bandwidth (the total data transfer capacity of a cable line) to subscribers (*id.* ¶¶ 14, 51-53, 179-95), failed to reduce the size of service groups (groups of subscribers connected via cable lines with a particular bandwidth) (*id.* ¶¶ 4 n.2, 53), or increase the number of channels for each service group (the channels that transport Internet data, which are the same as those that provide cable television service) (*id.* ¶¶ 4 n.3, 55).

The second component of Defendants' scheme consisted of promising subscribers reliable access to online content that they knew could not be provided. (*Id.* ¶¶ 19, 248-330.) Defendants failed to add more port capacity (*i.e.*, increase the number of physical hardware sockets where one network connects to another) where their network connected with online content providers when those ports became heavily congested. (*Id.* ¶¶ 19, 67-71.) As a result, customers attempting to access popular content experienced buffering, slowdowns, lags, interruptions, and down times. (*Id.* ¶¶ 20, 22.) Defendants actually went further and charged online content providers fees to increase port capacity to their content. (*Id.* ¶ 21.)

Since 2015, the New York Attorney General has fielded thousands of consumer complaints from subscribers who allege that they did not receive the Internet access speeds or reliable access promised to them by Defendants. (*Id.* ¶¶ 24-25.)

### Procedural History

On February 1, 2017, following a sixteen-month investigation, the New York Attorney General commenced this action in New York State Supreme Court. The complaint asserts the

following causes of action against Defendants: (1) Repeated or persistent fraudulent conduct in violation of N.Y. Exec. Law § 63(12) (Count 1); (2) Deceptive business practices in violation of N.Y. Gen. Bus. Law § 349 (enforceable by the Attorney General through N.Y. Exec. Law § 63(12)) (Counts 2 and 4); (3) False advertising in violation of N.Y. Gen. Bus. Law § 350 (enforceable by the Attorney General through N.Y. Exec. Law § 63(12)) (Counts 3 and 5).

On February 24, 2017, Defendants filed a Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1441, and 1446. (Dkt. No. 1.)

On March 13, 2017, Plaintiff moved to remand the action back to state court pursuant to 28 U.S.C. § 1447, and for attorney's fees and costs. (Dkt. No. 21.)

### Discussion

### I.    Applicable Legal Standards

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). They possess only the power authorized to them by the Constitution and by federal statute. *Id.* A civil action brought in state court may be properly removed to federal court *only* if it presents a claim over which the federal court would have original jurisdiction, 28 U.S.C. § 1441(a), such as one "arising under the Constitution, laws, or treaties of the United States," *id.* § 1331. If the federal court determines that it lacks subject-matter jurisdiction of the action – and thus, removal was improper – it must remand the case back to state court. *Id.* § 1447(c); *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 8 (1983).

To determine whether a claim arises under federal law, courts apply the "well-pleaded complaint" rule, which examines the well-pleaded allegations of the complaint to determine whether they present questions of federal law, ignoring any potential defenses:

5

[W]hether a case is one arising under the Constitution or a law or treaty of the United States . . . must be determined from what necessarily appears in the plaintiff's statement of his own claim in the [complaint], unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose.

*Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914) (citation omitted). Thus, if a complaint presents only state-law causes of action, the presence of a federal defense "will not provide a basis for removal." *See Franchise Tax Bd.*, 463 U.S. at 10. Under the general rule, "absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim." *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003).

However, there are several exceptions to this rule. The Supreme Court has recognized a few instances in which a federal court will have original jurisdiction over a complaint that, on its face, appears to allege only state-law claims. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004); *Beneficial*, 539 U.S. at 6; *Franchise Tax Bd.*, 463 U.S. at 22; *see also* Richard H. Fallon, Jr. et al., Hart and Wechsler's The Federal Courts and the Federal System 852-53 (7th ed. 2015).

The exception at issue in this case is the doctrine of "complete preemption." Under that doctrine, a federal court may have original jurisdiction over a seemingly state-law claim "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Beneficial*, 539 U.S. at 8. In a narrow number of instances, the Supreme Court has recognized that the "preemptive force" of a federal statute is "so powerful as to displace entirely any state cause of action" on the same subject. *Franchise Tax Bd.*, 463 U.S. at 22.

The doctrine of complete preemption is distinct from a traditional *defense* of federal preemption, the presence of which will not establish original jurisdiction. There are two traditional forms of defensive preemption: conflict and field preemption. Conflict preemption exists either (1) when it is "impossible for a private party to comply with both state and federal law," or (2) when, under the circumstances of a particular case, the challenged state law "stands

6

as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Field preemption exists when a state attempts to regulate "in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 132 S. Ct. 2492, 2501 (2012).

Complete preemption, on the other hand, exists only when (1) "the federal statute[] at issue provide[s] the *exclusive cause of action* for the claim asserted" and (2) the statute "also set[s] forth procedures and remedies governing that cause of action." *Beneficial*, 539 U.S. at 8 (emphasis added). In assessing whether Congress intended a federal cause of action to be the "exclusive" remedy for certain claims, "the proper inquiry focuses on whether Congress intended the federal cause of action to be exclusive rather than on whether Congress intended that the cause of action be removable." *Id.* at 9 n.5. There must be evidence, therefore, that Congress intended to "both preempt[] state law and substitute[] a federal remedy for that law, thereby creating an exclusive federal cause of action." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004).

The Supreme Court has recognized the existence of such "exclusive" causes of action in only three federal statutes: (1) in the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, which governs disputes between unions and employers over collective bargaining agreements, *see Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557, 560 (1968); (2) in the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, which Congress explicitly crafted to parallel 29 U.S.C. § 185 in the LMRA, *see Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64-66 (1987); and (3) in the National

Bank Act, 12 U.S.C. § 86, which governs suits to recover for usurious interest rates charged by national banks, *see Beneficial*, 539 U.S. at 8-11.

## II.  The Federal Communications Act

The instant complaint alleges only state-law claims, and there is no diversity, so Defendants' only argument for why this Court has original jurisdiction is that the Federal Communications Act ("FCA") provides the exclusive cause of action for false advertising and consumer protection claims against broadband Internet providers such that those claims are properly said to be arising under federal law. However, merely asserting as a defense that Plaintiff's claims are federally preempted (under either conflict or field preemption principles) is not sufficient to give this Court original jurisdiction over this action and "would not justify removal." *Beneficial*, 539 U.S. at 9. Thus, the Court must examine the FCA's statutory provisions as well the regulations issued under it by the Federal Communications Commission ("FCC").

The FCA, enacted in 1934, governs "all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(a), a phrase which includes the Internet. *Verizon v. FCC*, 740 F.3d 623, 629 (D.C. Cir. 2014). However, only entities that constitute "common carriers" are subject to regulation under Title II of the FCA. *See* 47 U.S.C. § 153(11). Title II subjects common carriers to various substantive requirements, including the requirement that all "charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable." *Id.* § 201(b).

The FCA establishes a federal cause of action against common carriers for violations of Title II's requirements, and it is this cause of action that Defendants argue is "exclusive." Section 206 provides that a common carrier shall be liable "for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable

8

counsel or attorney's fee." *Id.* § 206. Section 207 establishes a cause of action for an individual

to seek such damages:

> Any person claiming to be damaged by any common carrier subject to the
> provisions of this chapter may either make complaint to the [FCC] as hereinafter
> provided for, or may bring suit for the recovery of the damages for which such
> common carrier may be liable under the provisions of this chapter, in any district
> court of the United States of competent jurisdiction; but such person shall not
> have the right to pursue both such remedies.

*Id.* § 207. Sections 208 and 209 establish the procedure for bringing a complaint to the FCC and

for the FCC to award damages to a complainant. *See id.* §§ 208, 209. Finally, Section 415

establishes a general two-year limitations period for suits brought under Section 207. *See id.*

§ 415.

The FCA generally provides for dual state-federal regulation of Title II common carriers,

and Defendants' argument that Section 207 provides an exclusive federal remedy runs headlong

into the FCA's express savings clause, which states: "Nothing in this chapter contained shall in

any way abridge or alter the remedies now existing at common law or by statute, but the

provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

The statute also contains an express preemption provision: "No State or local statute or

regulation, or other State or local legal requirement, may prohibit or have the effect of

prohibiting the ability of any entity to provide any interstate or intrastate telecommunications

service." 47 U.S.C. § 253(a). However, that preemption provision is limited by the next clause,

which states: "Nothing in this section shall affect the ability of a State to impose, on a

competitively neutral basis and consistent with section 254 of this title, requirements necessary

to preserve and advance universal service, protect the public safety and welfare, ensure the

continued quality of telecommunications services, and safeguard the rights of consumers." *Id.*

§ 253(b).

The FCA provides that the FCC may declare that a particular state or local law is preempted by operation of Section 253(a), but it must do so through the notice-and-comment process: "If, after notice and an opportunity for public comment, the [FCC] determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the [FCC] shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency." *Id.* § 253(d). Thus, it appears that federal preemption under the FCA is determined on a case-by-case basis.

The FCC has not always categorized broadband Internet providers like Defendants to be "common carriers" subject to Title II regulation. In fact, it did not regulate them as such until very recently, and it is quite possible that they will cease being regulated as such in short order. *See* Ajit Pai, Chairman, FCC, Remarks at the Newseum: The Future of Internet Freedom (April 26, 2017), at 3. The history of this back-and-forth is worth recounting.

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, established a distinction between "telecommunications carriers" subject to common-carrier regulation under Title II, *see* 47 U.S.C. § 153(50), (51), (53), and "information-service providers" exempt from Title II regulation, *see id.* § 153(24). Initially, the FCC categorized Digital Subscriber Line ("DSL") service (broadband Internet service provided over telephone lines, as opposed to cable lines like those used by Defendants) as a telecommunications service, and Internet access as an information service. *See In re Deployment of Wireline Services Offering Advanced Telecommunications Capability*, 13 F.C.C. Rcd. 24012, 24029-30 ¶¶ 34-37 (1998). A DSL provider could exempt its Internet access services from Title II regulation only by operating those services through a separate affiliate. *Id.* at 24030 ¶ 37.

10

A few years later, however, the FCC concluded that cable broadband Internet service (like that provided by Defendants) constituted a "single, integrated information service" and not a telecommunications service like DSL. *In Re Inquiry Concerning High-Speed Access to Internet over Cable & Other Facilities*, 17 F.C.C. Rcd. 4798, 4824 ¶ 41 (2002) ("2002 Cable Broadband Order"). That interpretation of the Telecommunications Act was upheld by the Supreme Court in *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005). In *Brand X*, the Court held that the FCC's conclusion that "the transmission component of cable modem service is sufficiently integrated with the finished service to make it reasonable to describe the two as a single, integrated offering," *id.* at 990, was a reasonable interpretation of the ambiguous statute under the principles of *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984), because "a consumer cannot purchase Internet service without also purchasing a connection to the Internet and the transmission always occurs in connection with information processing," *Brand X*, 545 U.S. at 992.

However, after several years of unsuccessfully attempting to regulate cable broadband Internet service as an information service, *see Verizon*, 740 F.3d at 655-59, the FCC ultimately reversed course. In 2015, the FCC reclassified cable broadband Internet service as a telecommunications service subject to regulation under Title II. *In the Matter of Protecting & Promoting the Open Internet*, 30 F.C.C. Rcd. 5601, 5615-16 ¶¶ 47-50, 195 (2015) ("2015 Open Internet Order"). That reclassification was later upheld by the D.C. Circuit in *U.S. Telecom*, 825 F.3d at 697-711, which applied the principles set forth by the Supreme Court in *Brand X* and *Chevron* to give significant deference to the FCC's interpretation of the FCA.

Under the rulemaking authority delegated to it by the FCA, the FCC has issued regulations regarding the meaning of Section 201's "just and reasonable" language as it applies

11

to the disclosures made by broadband Internet access service providers. For example, a provider must "publicly disclose accurate information regarding the network management practices, performance, and commercial terms of its broadband Internet access services sufficient for consumers to make informed choices regarding use of such services and for content, application, service, and device providers to develop, market, and maintain Internet offerings." 47 C.F.R. § 8.3.

The FCC's transparency rules require fixed broadband providers (as distinguished from mobile providers) to disclose "actual network performance," which include metrics of "speed," "latency," and "packet loss." 2015 Open Internet Order, at 5674 ¶ 166. The regulations state that the FCC "expect[s] that disclosures to consumers of actual network performance data should be reasonably related to the performance the consumer would likely experience in the geographic area in which the consumer is purchasing service," and that "network performance will be measured in terms of average performance over a reasonable period of time and during times of peak usage." *Id.*

Fixed broadband providers may fulfill their disclosure requirements through various means, but the FCC has created two "safe harbor" programs that providers may rely upon to satisfy their obligations under the 2015 Open Internet Order and Section 201.

First, providers may participate in the Measuring Broadband America ("MBA") program, which measures various service metrics on an annual basis and publicly reports the results. The 2015 Open Internet Order specifically cited to a 2014 MBA report when describing how metrics like Internet speed should be measured. That report "focus[ed] on performance during peak usage period, which is defined as weeknights between 7:00 pm to 11:00 pm local time," which "provides the most useful information because it demonstrates the kind of performance users can

12

expect when the delivery of Internet service is under highest demand." FCC, Office of Eng'g & Tech. & Consumer & Governmental Affairs Bureau, *2014 Measuring Broadband America Fixed Broadband Report* 5 (2014) ("2014 MBA Report"). The 2014 MBA Report measured average broadband speeds both over a 24-hour period and during peak periods. *See id.* at 21-23. Separate from average broadband *speed*, however, the report also measured speed *consistency*, which is assessed by measuring "a specified percentage of users that receive an indicated percent of the advertised speed a specified percent of time." *Id.* at 23. "For example, for a specification of 70/70 (70 percent of people/70 percent of the time), consistent speed would indicate the minimum percent of advertised speed received by 70 percent of the consumers surveyed 70 percent of the time." *Id.*

In addition to the MBA program, the FCC also created a "Broadband Nutrition Label," which is "a voluntary safe harbor for the format and nature of the required disclosure to consumers," modeled on nutrition labels used for food products. *See* 2015 Open Internet Order, at 5679-81 ¶ 176-81. The version of the label for fixed broadband providers requires disclosure of, among other things, "typical speed downstream" and "typical speed upstream," which are measured during the "peak usage period." *See Consumer & Governmental Affairs, Wireline Competition, & Wireless Telecommunications Bureaus Approve Open Internet Broadband Consumer Labels*, 31 F.C.C. Rcd. 3358 (2016) ("Broadband Nutrition Labels").

However, FCC regulations make clear that even if a broadband provider uses the nutrition label format for its disclosure, it could still be found in violation of the FCA if the content of the disclosure is "misleading or inaccurate," or if the provider "makes misleading or inaccurate statements in another context, such as advertisements or other statements to consumers." 2015 Open Internet Order, at 5681 ¶ 181. The FCC has previously held that "unfair

and deceptive marketing practices by interstate common carriers constitute unjust and unreasonable practices under Section 201(b)." *In the Matter of Nobeltel, LLC*, 27 F.C.C. Rcd. 11760, 11762 (2012).

Defendants argue that the substantive standards of Section 201, which prohibit "unjust and unreasonable" practices by broadband Internet service providers, combined with applicable FCC regulations like the 2015 Open Internet Order, preempt state-law claims of false advertising and consumer protection against broadband Internet service providers, and that the enforcement provisions of Section 206 and Section 207 provide the "exclusive" federal cause of action for redressing those types of claims.

## III.   Analysis

For several reasons, the FCA does not provide the exclusive remedy for the claims asserted by Plaintiff against broadband Internet service providers like Defendants.

First, the clear text of the FCA's savings clause indicates that Congress did not intend for the federal statute to be the exclusive remedy for redressing false advertising and consumer protection claims against common carriers: "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U.S.C. § 414.

In *Marcus v. AT&T Corp.*, 138 F.3d 46, 53-54 (2d Cir. 1998), the Second Circuit pointed to this savings clause (among other things) to conclude that state-law claims of fraud, false advertising, and deceptive acts and practices brought by customers against their long-distance telephone provider were not completely preempted by either the FCA or federal common law. In so holding, the Second Circuit affirmed its earlier decision in *Nordlicht v. N.Y. Tel. Co.*, 799 F.2d 859, 861-62 (2d Cir. 1986), where it rejected the argument that the FCA completely preempted traditional state common-law claims like fraud against common carriers.

14

Second, the unique forbearance authority given to the FCC counsels against reading Section 207 as the only cause of action – state or federal – for consumer protection claims against common carriers. In another section of the FCA, Congress gave the FCC the authority to forbear from applying any provision of Title II (including Section 207) to any group of common carriers, if the FCC determines that application of the provision is "not necessary" to ensure compliance with the FCA or to protect consumers. *See* 47 U.S.C. § 160(a). In theory, this provision could allow the FCC to exempt any class of common carriers from Section 207's cause of action. It is hard to see how Congress could have intended to "substitute[] a federal remedy" for all state-law causes of action on a subject, *Briarpatch*, 373 F.3d at 305, while simultaneously giving the FCC the authority to waive that federal remedy altogether.

Third, nothing the FCC has said suggests that the FCA completely preempts state-law causes of action against telecommunications services for consumer protection and false advertising claims. In fact, in numerous regulations the FCC has said the opposite. For example, in the context of regulation of interstate telemarketing and advertising, the FCC stated that the FCA "does not indicate a uniquely federal interest in common carriers' unfair and deceptive telemarketing practices and, therefore, that state efforts to address these practices are not preempted." *In the Matter of Preferred Long Distance, Inc.*, 30 F.C.C. Rcd. 13711, 13717-18 ¶ 15 (2015). In the context of fair billing practices by interstate telephone providers, the FCC has stated that state regulators play an "important role" in "protecting consumers from unauthorized charges on their telephone bills." *In the Matter of Empowering Consumers to Prevent & Detect Billing for Unauthorized Charges (Cramming)*, 27 F.C.C. Rcd. 4436, 4476 ¶ 111 (2012).

For all of these reasons, the FCA's cause of action in Section 207 does not appear to be exclusive such that this Court would have original jurisdiction over this action. Remand would,

15

therefore, appear to be required. However, Defendants present three arguments that merit discussion.

First, Defendants argue that Section 207, by providing that a plaintiff seeking redress of a Section 201 violation may file *either* a suit in federal court *or* a complaint with the FCC – but not both – indicates a congressional intent to make the federal cause of action the exclusive remedy for consumer protection claims against common carriers. But that is simply not so – especially when this section is read in conjunction with the FCA's savings clause, which expressly preserves state statutory and common-law remedies. 47 U.S.C. § 414. Nothing about this structure indicates "that the FCC and the district court are the sole places to bring an action" against a Title II common carrier. *Johnson v. Am. Towers, LLC*, 781 F.3d 693, 703 n.6 (4th Cir. 2015).

There is also no merit to the argument that 47 U.S.C. § 207 closely parallels the causes of action in the LMRA, which the Supreme Court determined falls under the complete preemption doctrine. In deciding that the LMRA completely preempted state-law causes of action, the Supreme Court in *Avco* did not have to deal with a savings clause like the one Congress enacted in the FCA. As the Ninth Circuit has explained, the FCA's savings clause "is fundamentally incompatible with complete . . . preemption." *In re NOS Commc'ns, MDL No. 1357*, 495 F.3d 1052, 1058 (9th Cir. 2007).

Second, Defendants argue that broadband Internet access service should be treated differently than other telecommunications services because the FCC has declared that "broadband Internet access service is jurisdictionally interstate for regulatory purposes." 2015 Open Internet Order, at 5803 ¶ 431. But the FCC's acknowledgement of its own jurisdiction to regulate broadband providers does not necessarily mean that the only remedy for injuries caused

by broadband providers' fraudulent disclosures is "exclusively federal." Had the FCC intended

its regulations to have that effect, it could have used more explicit language to say so, rather than

state that it would approach preemption questions "on a case-by-case basis in light of the fact

specific nature of particular preemption inquiries." *Id.* at 5804 ¶ 433.

Furthermore, the FCA provides that, in order to utilize its power to declare state laws

preempted, the FCC must do so "after notice and an opportunity for public comment." 47 U.S.C.

§ 253(d). Such decisions are usually quite explicit about which state laws or requirements are

being preempted in a particular case. *See, e.g., In the Matter of Vonage Holdings Corp.*, 19

F.C.C. Rcd. 22404, 22404 ¶ 1 (2004) ("In this Memorandum Opinion and Order . . . , we

preempt an order of the Minnesota Public Utilities Commission . . . ."). While the 2015 Open

Internet Order was issued pursuant to ordinary notice-and-comment procedures, there is no

indication that this complete preemption question was ever presented for public comment or that

the FCC intended the order to preempt state-law claims like those asserted by Plaintiff.

None of the other FCC statements cited by Defendants suggests that the FCC intended to

completely preempt state-law consumer protection causes of action. In many decisions, courts

and the FCC have described the FCC as having "comprehensive" or "exclusive" jurisdiction over

certain interstate communications. *E.g., In the Matter of City of Wilson, N. Carolina Petition for*

*Preemption of N. Carolina Gen. Statute Sections 160a-340 et Seq.*, 30 F.C.C. Rcd. 2408 (2015).

However, all these decisions cite to the text of the FCA itself, which carves out from its express

preemption clause consumer-protection laws like those at issue here, *see* 47 U.S.C. § 253(b), and

also has a savings clause that declares state common-law and statutory remedies are not

preempted by the FCA, *see* 47 U.S.C. § 414. Therefore, the FCC's authority over interstate

communications may indeed be comprehensive, but it is not truly "exclusive" of all state laws on the subject.

Even if the FCC had explicitly declared that Section 207's cause of action were the exclusive remedy for Plaintiff's claims, it is unclear what weight that announcement would have. In *Beneficial*, the Supreme Court focused exclusively on the intent of *Congress*: "Only if *Congress* intended § 86 to provide the exclusive cause of action for usury claims against national banks would the statute [establish complete preemption]." *Beneficial*, 539 U.S. at 9 (emphasis added). Defendants point to no case in which a court has held that an agency, through rulemaking or otherwise, has declared a federal cause of action to be exclusive.

Finally, Defendants argue that the Second Circuit's decision in *Marcus*, which concluded that the FCA did not completely preempt state-law causes of action against common carriers, is no longer good law after two decisions that clarified the scope of the complete preemption doctrine: the Supreme Court's decision in *Beneficial* and the Second Circuit's decision in *Briarpatch*. *Marcus* relied, in part, on language in *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987), in which the Supreme Court described the test for complete preemption as whether "Congress has clearly manifested an intent to make [the relevant] causes of action . . . removable to federal court." *Id.* at 66. That logic – focused on congressional intent to make the cause of action *removable* – was explicitly rejected by the Supreme Court in *Beneficial*, which declared that "the proper inquiry focuses on whether Congress intended the federal cause of action to be *exclusive* rather than on whether Congress intended that the cause of action be *removable*." 539 U.S. at 9 n.5 (emphases added). In *Briarpatch*, the Second Circuit characterized the *Beneficial* decision as "extend[ing] the complete preemption doctrine" and concluded that the Copyright

Act, 17 U.S.C. §§ 501-513, completely preempts certain state-law claims. *Briarpatch*, 373 F.3d at 305. This gives some force to the argument that *Marcus* is no longer good law.

However, several other circuit and district courts have relied on *Marcus*'s holding to conclude that the FCA does not completely preempt state-law causes of action – even after the Supreme Court's decision in *Beneficial*. In 2007, the Ninth Circuit relied on *Marcus* (and the savings clause in Section 414) to conclude that "complete preemption does not apply to federal regulation under the FCA." *In re NOS Commc'ns*, 495 F.3d at 1058. That case involved a plaintiff who sought damages against an interstate telecommunications provider under the Washington Consumer Protection Act for "marketing false billing information and by failing to notify consumers of differences between the quoted price and the actual price." *Id.* at 1057.

In *Johnson v. Am. Towers, LLC*, 781 F.3d 693 (4th Cir. 2015), the Fourth Circuit concurred with the decisions in *Marcus* and *In re NOS Communications*, concluding that a state-law suit brought by a correctional officer against a cellphone company after he was shot in an attack ordered by a prison inmate via a contraband cellphone was not completely preempted by the FCA. The Fourth Circuit noted that, as a common carrier, the cellphone company was subject to the substantive requirements of Section 201 and the remedial provisions of Section 207. However, the Circuit concluded that Section 207 was not designed to provide the exclusive remedy for claims of this type against common carriers, because of the savings clause in Section 414. *Id.* at 702-03.

Numerous district courts outside of this Circuit have also followed the decision in *Marcus* after the Supreme Court's decision in *Beneficial*. *See, e.g.*, *Kinsey v. Va. Elec. & Power Co.*, No. 5:16-CV-00058, 2016 WL 7422257, at *5 (W.D. Va. Dec. 22, 2016); *Baraga Tel. Co. v. Am. Cellular Corp.*, No. 2:05-CV-242, 2006 WL 1982637, at *9 (W.D. Mich. July 12, 2006);

*Trevino v. Sw. Bell Tel. Co., L.P.*, No. CIV.A. M-04-377, 2005 WL 2346950, at *4 (S.D. Tex. Sept. 26, 2005); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 343 F. Supp. 2d 838, 851 (W.D. Mo. 2004). All of these cases lend support to the conclusion that *Marcus*'s holding retains its vitality and binds this Court.

Defendants' reliance on a decision from the Seventh Circuit that appears to disagree with the holding in *Marcus* is misplaced. In *Cahnmann v. Sprint Corp.*, 133 F.3d 484 (7th Cir. 1998), the Seventh Circuit dealt with a class action brought by customers of a long-distance telephone company alleging breach of contract – not a consumer protection claim. The contract at issue was subject to the "filed rate doctrine," meaning that the company had to file the terms and conditions of the contract (called a "tariff") with the FCC, after which point the company could not deviate from the tariff without the FCC's approval. The Seventh Circuit concluded that the suit was a challenge to the tariff itself, which, under the filed-rate doctrine, "is the equivalent of a federal regulation." *Id.* at 488. Therefore, the court concluded that the suit could only arise under federal law. *Id.* at 489.

The *Cahnmann* decision is easily distinguishable from this case, as *Marcus* makes clear. In *Marcus*, the Second Circuit *agreed* with the Seventh Circuit's conclusion in *Cahnmann* that, because a federal tariff is not merely a contract but a federal regulation, a challenge to a tariff is an inherently federal claim that is completely preempted by the FCA. *Marcus*, 138 F.3d at 55. The Second Circuit then went on to assess a breach of warranty claim that the court concluded was itself a challenge to a federal tariff. *Id.* at 56. That claim "necessarily raise[d] a substantial federal question over which federal courts may properly exercise jurisdiction." *Id.* All of this comes in the same decision that held that the FCA does *not* completely preempt state statutory and common-law consumer protection claims against common carriers. *Id.* at 54-55. *Marcus*

20

makes clear that *Cahnmann*'s logic does not conflict with the conclusion that the FCA does not completely preempt consumer protection claims like those at issue here.

Because the FCA does not preempt state-law consumer protection and false advertising claims against telecommunications service providers, the claims at issue here are not completely preempted. If Defendants can demonstrate that New York's laws conflict with federal law, they may well have a viable defense of federal preemption. But a viable conflict preemption defense does not equate to complete preemption, which would be needed for this Court to have original jurisdiction over this case. Removal was, therefore, improper, and this action must be remanded back to state court. 28 U.S.C. § 1447.

## IV.   Attorney's Fees

Plaintiff asks the Court to award it attorney's fees and costs for the expenses incurred as a result of Defendants' improper removal. That aspect of the motion is denied. "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c). As the Supreme Court has explained, "Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). Defendants' motion for removal was not so lacking in merit as to be objectively unreasonable.

### Conclusion

For the foregoing reasons, Plaintiffs' motion to remand this case to the New York Supreme Court (Dkt. No. 21) is GRANTED. Plaintiff's request for attorney's fees is DENIED. Defendants' motion for oral argument (Dkt. No. 26) is DENIED as moot.

The Clerk of the Court is directed to remove Dkt. Nos. 21 & 26 from the Court's list of pending motions and to close the file.

Dated: April 27, 2017

_____
U.S.D.J.

BY ECF TO ALL COUNSEL